**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER EVERETT, on behalf of himself and a proposed class** | ) ) ) | |
| **Plaintiff,** | ) | **Case No. 1:13-cv-04697** |
| **v.** | ) ) | |
| **JOHN R. BALDWIN, in his official** | ) | **Judge Edmond E. Chang** |
| **capacity as Acting Director of the Illinois** | ) | **Magistrate Judge Geraldine Soat Brown** |
| **Department of Corrections; and TARRY** | ) | |
| **Williams, in his official capacity as Warden** | ) | **CLASS ACTION COMPLAINT** |
| **of Stateville Correctional Center,** | ) ) | |
| **Defendants.** | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff Christopher Everett ("Plaintiff"), on behalf of himself and a proposed class, alleges as follows for his Second Amended Complaint against John R. Baldwin ("Baldwin"), in his official capacity as Acting Director of the Illinois Department of Corrections ("IDOC") and Tarry Williams ("Williams") (collectively, "Defendants"), in his official capacity as Warden of Stateville Correctional Center ("Stateville").

## NATURE OF THE ACTION

1.    Throughout Plaintiff's incarceration at Stateville, Defendants have repeatedly failed to provide him with necessary medical treatment and accommodations.  More specifically, and as discussed in more detail herein, when Plaintiff injured himself in June of 2009 and again in April of 2013, Defendants refused to provide Plaintiff with medical attention or treatment for multiple days.  And when Plaintiff was able to see a medical professional, IDOC failed or refused to honor medical prescriptions and permits Plaintiff received from the medical professional provided by IDOC.

2.     Defendants failed Plaintiff at every turn.  These failures to provide Plaintiff with necessary medical treatment and medically-necessary accommodations have deprived Plaintiff of his rights under the Eighth Amendment to the United States Constitution as well as his rights under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("RA").

3.     Moreover, there is a pattern and practice of IDOC categorically refusing to enforce low gallery and low bunk permits at Stateville in spite of medical evaluations indicating that inmates should be placed in low galleries and/or low bunks.  Indeed, many cases have been brought by inmates at Stateville accusing IDOC of failing to honor low gallery and low bunk permits.  See, e.g., Johnson v. Godinez, 2015 WL 135103, at *1-3 (N.D. Ill. Jan. 9, 2015) (Stateville inmate complaining of placement inconsistent with a medical permit); Hunt v. Hardy, 2012 WL 2458943, at *4-5 (N.D. Ill. June 27, 2012) (same); McPherson v. Bunch, 2004 WL 1151566, at *1 (N.D. Ill. May 3, 2004) (same); Spivey v. Godinez, 1995 U.S. Dist. LEXIS 13640, at *43-44 (N.D. Ill. Sept. 14, 1995) (Stateville inmates have been litigating this issue for more than 20 years).  In addition, IDOC has repeatedly refused to honor Plaintiff's low gallery and low bunk permits.

4.     As such, Plaintiff brings this lawsuit pursuant to 42 U.S.C. § 1983, the ADA and the RA, seeking declaratory and injunctive relief as well as individual damages for himself as a result of Defendants' violations of Plaintiff's rights under the Eighth Amendment, the ADA and the RA.

5.     Plaintiff also seeks declaratory and injunctive relief on behalf of a proposed class (as defined herein) for the continuing violations of 42 U.S.C. § 1983 by Defendants Baldwin and Williams based upon the official policy and widespread custom and practice of IDOC of failing or refusing to honor the medical permits of Plaintiff and other inmates at Stateville.

## THE PARTIES

### Plaintiff

6.      Plaintiff is an inmate with IDOC and has been incarcerated in Stateville since 2003.

### Defendants

7.      Defendant Baldwin has been the Acting Director of IDOC since August 14, 2015. Upon information and belief, Baldwin is responsible for establishing IDOC policies, customs and practices as discussed herein.  In all of his actions, Baldwin was acting under color of state law and in the course of his employment.  The claims being made against Baldwin are brought against him in his official capacity.

8.      Defendant Williams is employed by IDOC as Warden of Stateville.  Upon information and belief, Williams is responsible for establishing Stateville policies, customs and practices as discussed herein.  In all of his actions, Williams was acting under color of state law and in the course of his employment.  The claims being made against Williams are brought against him in his official capacity.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because it is a civil action arising under the ADA, the RA and the Eighth Amendment to the United States Constitution, as made applicable to the states through the Fourteenth Amendment.

10.      This Court is authorized to render declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

11.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391, because all of the events and policies at issue took place or were applied at Stateville, located in Will County, Illinois, which is located within the Northern District of Illinois.

## PLAINTIFF'S FACTUAL ALLEGATIONS

### A.     After Two Serious Injuries In April Of 2013, Plaintiff's Medical Needs Are Ignored

12.     In April of 2013, Plaintiff seriously injured his left knee while in his cell.  He was unable to fully bend or extend his left leg, and it felt as if a ligament connected to his knee popped each time he tried.  He, in turn, experienced constant throbbing pain.

13.     On April 16, 2013, Plaintiff was seen in the Stateville healthcare unit, where he was prescribed crutches for two weeks and was prescribed a low gallery and low bunk permit by Jennifer A. Asante, a Licensed Practical Nurse.

14.     His prescriptions were not converted into medical permits and Plaintiff did not receive any of the prescribed relief, because, on information and belief, IDOC and Stateville will only provide prescribed relief if the relief is written on medical permit paperwork.

15.     Plaintiff filed a grievance the following day complaining of failures by healthcare unit staff and correctional staff to provide relief.

16.     Plaintiff returned to the Stateville healthcare unit on April 23, 2013 -- after a full week without medically-prescribed crutches, a low gallery or a low bunk -- and was re-prescribed two crutches for seven days and a low bunk (but not a low gallery) for one month. This time, Plaintiff also received a permit for the prescribed relief.

17.     Despite that permit, however, IDOC took no actions to move Plaintiff into a low bunk or to otherwise honor the permit provided to Plaintiff by medical personnel at Stateville.

Nor had IDOC previously taken any action to move Plaintiff to a low gallery or low bunk in accordance with the prescriptions he received on April 16, 2013.

18.     On April 28, 2013 -- while relegated to the top bunk in the highest gallery of his cell house, despite his prescription for a low gallery, his permit requiring a low bunk and his use of crutches -- Plaintiff re-injured his knee while in his cell.  Plaintiff was compensating for his already injured left knee, and after bending over to move his belongings, Plaintiff found that he was in severe and constant pain.

19.     Plaintiff immediately laid down on the floor, in front of the door to his cell and asked a correctional officer for help.  That correctional officer said that he had contacted the healthcare unit but could not do anything else for Plaintiff.

20.     After waiting for an hour and fifteen minutes, while still lying on the floor of his cell and having not received any medical attention, Plaintiff again asked the same correctional officer for help.  That correctional officer repeated that he had contacted the healthcare unit and could not do anything else for Plaintiff.

21.     Approximately thirty minutes later -- now an hour and forty-five minutes after Plaintiff re-injured his knee -- a correctional officer announced that Christian inmates could leave their cells to attend church services.  Plaintiff took this opportunity to check out of his cell and attempt to seek help elsewhere.

22.     Plaintiff, still in pain and unable to fully use his left leg, slowly descended from the fifth floor to the ground floor of his cell house.  He again requested help, this time in the form of a wheelchair and assistance getting to the healthcare unit, and sat in the "bull pen" area of his cell house for an hour to an hour and a half waiting for the requested help.

23.     Had IDOC honored Plaintiff's medical prescriptions and permits from April 16 and April 23, 2013, Plaintiff would not have had to drag himself down five flights of metal stairs, in significant pain, to try to secure emergency medical relief.

24.     Eventually, a correctional officer obtained a wheelchair for Plaintiff and wheeled him to the outside of the healthcare unit.

25.     Instead of receiving medical help when he finally arrived at the healthcare unit more than three hours after being injured, Plaintiff was denied entry to the healthcare unit.  He was informed by Shanal Barnett, a medical technician on duty, that he would not be allowed to enter the healthcare unit that day because he was on a list to be seen in the healthcare unit on April 30, 2013, two days later.

26.     Plaintiff, desperate for some relief and assistance, explained that he was in severe pain, could not stand upright, and could not walk, and Plaintiff begged Barnett to help him. Barnett, however, refused to evaluate Plaintiff or allow him to enter the healthcare unit.

27.     Unable to receive medical attention and unable to stand up and return to his cell, Plaintiff was returned to the "bull pen" area in his cell house where he sat for hours in the hopes of being seen by a medical technician assigned to that cell house.

28.     Karen Fryerson, the medical technician assigned to Plaintiff's cell house, finally visited Plaintiff sometime after dark.  She offered Plaintiff Tylenol but otherwise confirmed that she would not or could not help him, because he was scheduled to be seen in the healthcare unit approximately two days later.

29.     Upon information and belief, Barnett and Fryerson were acting pursuant to IDOC and/or Stateville official policy and widespread custom and practice in refusing to diagnose or treat Plaintiff because he was scheduled to be seen in the healthcare unit at a later date.

30.     Unable to secure any medical attention and having sat in the "bull pen" in his cell house for approximately ten to twelve hours after being denied treatment in the healthcare unit, Plaintiff asked Richanda Carr ("Carr") and Richard Samuelson ("Samuelson"), both correctional officers, for an emergency low gallery/low bunk assignment based on his inability to stand, let alone climb five flights of stairs to his cell and climb into his top bunk, for which, as discussed in more detail below, Plaintiff was not given a ladder.  Given that Plaintiff was using crutches, had been prescribed a low gallery and had a permit for a low bunk, the request should not have even needed to be made.

31.     Carr and Samuelson, who upon information and belief had authority to grant Plaintiff an emergency cell reassignment, refused Plaintiff's request and in so doing, refused to respond to Plaintiff's obvious and objectively clear medical need.  They also refused to assist Plaintiff in receiving any medical attention and refused to ensure that IDOC complied with Plaintiff's low bunk permit.

32.     Instead, Samuelson ordered Plaintiff to return to his cell or be sent to segregation.

33.     In an effort to avoid being punished, Plaintiff spent at least thirty minutes crawling from the ground floor to his cell on the fifth floor.  Plaintiff alternately crawled backwards up flights of stairs, lifting himself onto a higher stair with his arms and dragging his legs along with him, and hobbled up flights of stairs while using only his right leg.  The pain was considerable.  Not a single officer or employee of IDOC or Stateville, however, assisted Plaintiff in returning to his cell or seeking medical attention.

34.     When Plaintiff finally arrived in his cell, he was exhausted.  He could not stand upright, much less climb into his top bunk, and was forced to lay and eventually sleep on the

floor of his cell. Plaintiff remained on the floor of his cell for the remainder of April 28, 2013 and all of the following day.

35.     After spending two days in pain on the floor of his cell, Plaintiff was finally seen in the healthcare unit on April 30, 2013. Due to the severity of his injuries, Plaintiff was prescribed pain medication, two weeks of lay-in privileges and a low gallery and low bunk for ninety days by Saleh Obaisi, a Medical Doctor.

36.     Plaintiff, however, did not receive this prescribed relief. As a result, Plaintiff was forced to spend much of the period between April 30, 2013 and May 14, 2013 on the floor of his cell, including while he slept.

37.     On May 14, 2013, Plaintiff was again seen in the healthcare unit. This time, he was prescribed and received a permit for one crutch for two weeks and a low gallery and low bunk for three months.

38.     Again, however, IDOC failed or refused to honor Plaintiff's permit; he was never assigned to a low bunk or a first-floor cell at any point between May 14 and August 14, 2013.

39.     IDOC similarly failed or refused to assign Plaintiff to a low bunk in response to medical permits dated October 29, 2013 and November 12, 2013 requiring the same. As before, Plaintiff was forced to spend much of the time around these dates on the floor of his cell, including while he slept.

### B.     Plaintiff's Experience In 2013 Was Not Unique, As Stateville Has A History Of Failing And Refusing To Provide Inmates With Immediate And Necessary Medical Attention

40.     Upon information and belief, Stateville frequently denies immediate medical attention to inmates, and inmates often wait days or months before seeing a doctor. See, e.g., 2013 Monitoring Report of John Howard Association of Illinois ("JHA Report"), Ex. A hereto, at 1, 8-9 ("Although Stateville reported 13,352 sick call visits for 2012, some inmates reported

that they had not seen healthcare staff because sick call requests were ignored, with reports of no response in more than two months. . . . Inmates reported that physicians are frequently not at the facility and appointments are cancelled."); December 2014 Final Report of the Court Appointed Expert in <u>Lippert v. Godinez</u>, Ex. B hereto (excerpt), at 6-7, 18 (Stateville experiences "process and care breakdowns on a daily basis," "23 of Stateville's 66 budgeted [medical] positions are vacant," including "key leadership positions," and a "particular concern" at Stateville "is the frequent arbitrary cancelling of sick call encounters by security staff," which "represent significant impediments to access to care and result in delays in treatment."); <u>id.</u> App'x A, February 2014 Stateville Correctional Center Report, at 3 ("There is a major problem with access to care at this facility.").

41.     Indeed, several years earlier, in or about June of 2009, Plaintiff was similarly denied timely medical attention.  Plaintiff slipped and fell while climbing down from his top bunk, which fall caused a serious injury to Plaintiff's back and sharp pains when he sat and stood.

42.     Given that Plaintiff was having difficulty standing and walking, he requested to see a doctor immediately, but his request was denied.  In fact, despite his serious injury, Plaintiff was not seen in Stateville's healthcare unit until two days later.

43.     And when Plaintiff was finally able to see a medical professional, he was given over-the-counter pain medication, was advised to stay in bed and off his feet for one week and then walk only with the use of two crutches for the following two to three weeks and was also given a three-month low gallery/low bunk permit, which was promptly ignored, as discussed in Paragraphs 45 to 52 below.

### C.  Starting In 2009, Plaintiff's Medical Prescriptions
### And Permits Are Repeatedly Ignored

44.     In addition to not having his medical needs met on a timely basis, Plaintiff's medical prescriptions and permits -- specifically relating to low galleries and low bunks -- were deliberately ignored on multiple occasions.

45.     The low bunk permit was particularly important, because inmates at Stateville are not provided with ladders or step stools that might assist them in climbing onto a top bunk that is nearly six feet off the ground.  Without a ladder or other assistance to climb into their beds, inmates are forced to climb onto the combination sink/toilet, which was more often than not slippery and wet, leap more than three feet to the bunk bed, grab the top bunk and pull themselves onto it.  Climbing down is no less difficult.  Inmates are forced to wriggle to the edge of the bed, stretch their legs as close to the combination sink/toilet as they can, jump as carefully as possible onto the likely slippery and wet combination sink/toilet and then climb to the ground.

46.     For example, after his injury in 2009 (which was actually caused by falling when attempting to climb, without the assistance of a ladder, from his top bunk), Plaintiff was given a three-month low gallery/low bunk permit, as having to climb stairs and into a top bunk with an injured back was not medically advised.

47.     Despite having a low gallery/low bunk permit, however, Plaintiff was left in his high gallery cell and in his top bunk for approximately one month.

48.     Because Plaintiff's medical needs were ignored for a full month, Plaintiff was forced to continually climb up and down stairs multiple times a day for basic necessities like meals.  He was also frequently forced to sleep on the floor, as the injury to his back often prevented him from being able to haul himself into bed.

49.     When Plaintiff was finally moved to a lower gallery (a cell on the second floor) in or about July of 2009, he still was not provided a low bunk, and Plaintiff was forced to continue to sleep on the floor on the days when his back hurt too much for him to climb in and out of his top bunk.

50.     In fact, Plaintiff <u>never</u> received the medically-necessary accommodations that were ordered by a medical provider during the summer of 2009.

51.     As a result of failing to receive his medically-necessary accommodation, Plaintiff's injury persisted and even worsened.  Plaintiff continued to have back pain and spasms for several years, and he even injured his knee attempting to compensate for the weakness and pain in his back.

### D.     Stateville Inmates' Medical Prescriptions And Permits Are Routinely Ignored Or Disregarded Altogether

52.     Indeed, upon information and belief, IDOC and Stateville have an official policy and widespread custom and practice of refusing to grant or honor low gallery/low bunk permits. <u>See</u>, <u>e.g.</u>, JHA Report at 10 ("Many healthcare complaints JHA received related to conditions of an older population, including things like requests for lower bunk permits. IDOC officials noted that while they will grant bottom bunk requests when appropriate, they do not grant bottom gallery requests.").

53.     While some IDOC facilities assign inmates to top or bottom bunks, Stateville does not.

54.     Neither Stateville nor IDOC maintains any written policy or procedure relating to compliance with medical permits requiring low galleries, low bunks or both.

55.     After his injury in April of 2013, Plaintiff was on crutches and was prescribed a low gallery and low bunk.  But despite his medical prescriptions and permit and use of crutches,

Plaintiff was left in a <u>top</u> bunk on the <u>highest</u> gallery of his cell house, requiring him to climb to the fifth floor and attempt to jump from his combination sink/toilet to his top bunk, all while on crutches and suffering from severe pain.

56.     As a result, Plaintiff was again frequently forced to sleep on the floor of his cell.

57.     Moreover, because Plaintiff was often unable to climb the stairs, he was denied equal access to many basic necessities, such as meals (the dining hall is on the ground floor) and showers (the showers are also on the ground floor), and otherwise was denied access to many prison facilities as a practical matter.

58.     Despite repeated verbal requests that his medical prescriptions and permits be honored starting on April 16, 2013, Plaintiff remained on the highest gallery and in a top bunk.

59.     Having not received any assistance obtaining accommodations consistent with his medical prescriptions and permit, Plaintiff filed grievances on April 17, 2013 and April 28, 2013, specifically addressing the failure to place him on a low gallery and in a low bunk consistent with his medical prescriptions and permit.

60.     Although Plaintiff indicated that his grievances in April of 2013 were emergencies, his April 17, 2013 grievance was not reviewed for emergency status until April 25, 2013 and was not responded to until May 1, 2013.  Notably, however, Plaintiff's April 28, 2013 grievance, also labeled as an emergency, was not reviewed for emergency status until May 3, 2013 and was never responded to and was, instead, stamped "INMATE ISSUES" on May 23, 2013 and returned to Plaintiff.

61.     The eventual response to Plaintiff's April 17, 2013 grievance, however, implicitly recognized the severity of Plaintiff's situation, as it indicated that Plaintiff should and would be moved in order to accommodate his medical needs.

62.    Plaintiff received another low gallery and low bunk permit on May 14, 2013.  He was moved from cell D-933 (on the highest floor of the cell house) to cell D-539 (on the third floor of the cell house) at approximately 4:00 p.m. the same day.  His new cell was not on a low gallery, and he was not guaranteed a low bunk, as he was told to simply work it out with his new cellmate.

63.    Plaintiff's new cellmate refused to give up his low bunk and threatened to kill Plaintiff if he was forced to give Plaintiff the low bunk.

64.    As a result, Plaintiff was forced to continue to sleep on the floor of his cell or risk serious bodily harm from his cellmate for insisting that his cellmate give up the low bunk.

65.    Plaintiff felt unable to complain about his situation to security staff, for fear of being injured or killed by other inmates for "snitching" on his cellmate.

66.    On May 17, 2013, Plaintiff filed another grievance regarding his placement, noting that despite his low gallery/low bunk permit and a response to a prior grievance indicating his medical needs should be accommodated, he was placed in a cell in which his cellmate did not want to give up the low bunk and threatened to harm Plaintiff.  Afraid of retaliation for having to report his cellmate for not giving up the low bunk, Plaintiff specifically asked IDOC to "move [him] to where there is a bottom bunk available," rather than keep him in the same cell and make his cellmate change bunks.  Again, however, Plaintiff's grievance, marked as an emergency, was not reviewed for emergency status until May 31, 2013 (two weeks later) and was not responded to until August 5, 2013 (more than eleven weeks later).

67.    After nearly three more weeks of being housed on the third floor of his cell house, Plaintiff was moved to cell D-349 on June 3, 2013, and then to cell D-344 more than three weeks later.  These cells were on the second floor of Plaintiff's cell house, meaning Plaintiff still had to

climb and descend stairs in order to participate in programs and activities such as meals and showers.

68. The damage to Plaintiff was significant. As a result of failing to receive accommodations consistent with his medical prescriptions and permits, Plaintiff's injury persisted. His injuries were unpredictable, often flaring up after Plaintiff was forced to exert himself, such as when Plaintiff had to climb varying numbers of stairs and try to maneuver himself into a top bunk multiple times per day.

69. Plaintiff was moved into cell F-242 on August 2, 2013. At this time, there were less than two weeks remaining in Plaintiff's three-month low gallery and low bunk permit issued May 14, 2013. Unlike certain other cell houses, in which 200-level cells are on the first floor, cell F-242 is on the second floor of F house and inmates must climb stairs in order to access it.

70. In another instance in November of 2013, Plaintiff had a low bunk permit but was moved to a cell in which another cellmate refused to give up the low bunk.

71. Desperate for relief, Plaintiff notified a correctional officer of this situation in confidence and asked to be moved to a cell in which a low bunk was available. That correctional officer, in turn, notified Karen Rabideau ("Rabideau") and Shaun Bass ("Bass"), correctional counselors responsible for assigning inmates to cells and accommodating low gallery/low bunk permits.

72. The same correctional officer told Plaintiff that Rabideau and Bass knew about Plaintiff's situation but refused to address it. Specifically, Rabideau and Bass said that there were no low galleries and low bunks available, despite the fact that Plaintiff knew of certain inmates who did not have low gallery or low bunk permits but nevertheless had low galleries and/or low bunks.

14

73.     Receiving no relief from the correctional officers or counselors, Plaintiff filed another grievance on November 24, 2013.  Plaintiff again complained that no low bunk had been secured for him, despite his low bunk permit, leaving him to "argue or possibly fight with" his cellmate -- or perhaps report his cellmate to authorities, but putting himself directly in harm's way in any case -- in order to secure accommodations consistent with his medical prescriptions and permits.

74.     Plaintiff's grievance was responded to on December 6, 2013 with a statement that Plaintiff was not entitled to a low gallery/low bunk.  The response included as an attachment a permit that expired on November 12, 2013 and omitted the fact that Plaintiff had received a renewal of that permit through December 30, 2013.

75.     Upon information and belief, each and every instance in which Plaintiff was denied medical accommodations was consistent with IDOC or Stateville official policy and widespread custom and practice by which both placement staff and security staff pass the buck and refuse responsibility for ensuring that inmates receive low galleries, low bunks or both consistent with their medical prescriptions and/or permits.

76.     Indeed, in a letter dated January 2, 2014, Rabideau -- Stateville's primary placement officer -- wrote to Plaintiff that it was not her responsibility to see that he receive a low bunk and that he should raise any concerns about his inability to secure a low bunk with security staff.  In each instance where Plaintiff spoke to security staff, however, he was told to speak with the placement officer to enforce his medical permits.

77.     Upon information and belief, IDOC's and Stateville's failures and refusals to timely comply with Plaintiff's medical permits are by no means unique to Plaintiff.  Instead, as a direct and proximate result of IDOC's and Stateville's decisions to not assign inmates to specific

bunks and to not maintain written policies for compliance with low gallery and/or low bunk permits, inmates at Stateville are continually denied timely assignment to low galleries, low bunks or both, despite having medical permits and/or obvious medical needs requiring the same.

78.     IDOC and/or Stateville staff had numerous opportunities to ensure compliance with Plaintiff's low bunk permits but failed or refused to do so.  For example, IDOC and/or Stateville staff escorted Plaintiff each time he was moved to a new cell, including instances in which he was moved based on a medical permit.  IDOC and/or Stateville staff could have ordered Plaintiff's new cellmate to give Plaintiff the lower bunk -- easily, immediately and consistent with Plaintiff's medical prescriptions and permits -- in each such instance.

### E.     IDOC Refuses To Accommodate Plaintiff's Disability In His Work Assignment

79.     Adding insult to injury, not only was Plaintiff denied timely medical attention and appropriate medical accommodations, but he was also discriminated against based upon his temporary disability.

80.     Prior to his injury in April of 2013, Plaintiff performed janitorial duties in the prison barbershop.  Bobby Mattison ("Mattison"), an IDOC employee who supervised the barbershop, was Plaintiff's supervisor.

81.     Plaintiff notified Mattison of his injury shortly after he was injured.  Mattison authorized Plaintiff to take time off to recover and return to work when he was able.

82.     In October of 2013, while still using a crutch, Plaintiff reported to his job assignment and successfully performed his duties.

83.     The following day, Plaintiff reported to work but was turned away by Mattison, who told Plaintiff not to return while on crutches.

84.     Mattison issued this order despite the fact that Plaintiff performed his job duties while on crutches one day earlier.

## **CLASS ALLEGATIONS**

85.     Plaintiff brings a class action claim pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, seeking prospective declaratory and injunctive relief against Defendants Baldwin and Williams in their official capacities relating to their failure to ensure that IDOC and/or Stateville comply with medical permits requiring low galleries, low bunks or both (the "Class Claim").

86.     Plaintiff brings the Class Claim on behalf of himself and all inmates of IDOC who from June 26, 2011 to present received medical permits requiring placement in a low gallery, low bunk or both.

87.     Class action status is proper for the Class Claim, because the class of persons described in Paragraph 87 above is so numerous that the individual joinder of all absent class members is impracticable and because Defendants Baldwin and Williams, in their official capacities, have acted and refused to act on grounds that apply generally to the class, making final injunctive relief and declaratory relief appropriate for the class as a whole.  While the inmate population of Stateville and the number of inmates subject to medical permits requiring low galleries and/or low bunks at Stateville fluctuate, the exact number of absent class members is unknown to Plaintiff at this time but will be ascertainable upon appropriate discovery from Defendants Baldwin and Williams.

88.     Common questions of law or fact exist as to each of the members of the proposed class, including but not limited to whether Defendants Baldwin and Williams have violated and continue to violate inmates' Eighth Amendment rights by failing to ensure that IDOC and/or Stateville complies with medical permits requiring low galleries, low bunks or both.

89.     Plaintiff is a proper representative of the proposed class, because he is a member of the class described in Paragraph 87 above.  Plaintiff's claims are typical of the claims of the proposed class.  Plaintiff has repeatedly received low gallery and/or low bunk permits that IDOC and/or Stateville refused to enforce in violation of the United States Constitution and federal law.

90.     Plaintiff will fairly and adequately represent the interests of the members of the proposed class and has no interests in conflict with those of the proposed class.  This Court has appointed competent attorneys who are experienced in class action and complex litigation to represent Plaintiff in this matter.

91.     The proposed class may properly be certified under Federal Rule of Civil Procedure 23(b)(2), because Defendants Baldwin and Williams have acted in a manner generally applicable to the proposed class as a whole, making final injunctive relief appropriate with respect to the proposed class as a whole.

## CAUSES OF ACTION

### COUNT I
**Deliberate Indifference To Serious Medical Need In Violation Of 42 U.S.C. § 1983
(By Plaintiff And Members Of The Proposed Class Against
Defendants Baldwin And Williams In Their Official Capacities)**

92.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 91 above.

93.     Between June 26, 2011 and present, Plaintiff and members of the proposed class received medical permits requiring that they be placed in low galleries, low bunks or both.

94.     Receipt of a medical permit requiring placement in a low gallery and/or low bunk gave Defendants Baldwin and Williams, operating in their official capacities, persuasive evidence of a serious medical need.

95.     Defendants Baldwin and Williams maintain official policies relating to the provision of medical care within Stateville but do not maintain any written policy pertaining to

18

compliance with medical permits requiring placement of inmates in low galleries, low bunks or both at Stateville.

96. Between June 26, 2011 and present, Plaintiff and members of the proposed class exhibited easily detected symptoms or conditions requiring placement in low galleries, low bunks or both, such as the use of crutches or other plainly visible restrictions on mobility.

97. Defendants Baldwin and Williams maintain official policies relating to the provision of medical care within Stateville but do not maintain any written policy pertaining to reassignment of inmates to low galleries, low bunks or both based on plainly apparent medical needs for same.

98. Defendants Baldwin and Williams and their respective agents knew that Plaintiff and members of the proposed class had medical permits requiring placement in low galleries and/or low bunks and exhibited obvious medical needs for reassignment to low galleries and/or low bunks between June 26, 2011 and present.

99. As a direct and proximate result of Defendants' failure to maintain policies relating to compliance with low gallery and/or low bunk permits or reassignment of inmates to low galleries or low bunks based on obvious medical needs, Defendants and their respective agents repeatedly failed to honor medical permits requiring that Plaintiff and members of the proposed class be placed in low galleries, low bunks or both.

100. Absent an injunction, Defendants and their respective agents will continue to fail to honor low gallery and/or low bunk permits and fail to reassign inmates to low galleries or low bunks based on obvious medical needs.

**COUNT II**
**Violation Of ADA And RA**
**(By Plaintiff Against Defendants Baldwin And Williams In Their Official Capacities)**

101. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 100 above.

102. The State of Illinois accepts federal funds for its prisons, and IDOC and Stateville are therefore subject to the RA.

103. Plaintiff, due to his injuries and while using crutches and/or subject to low gallery/low bunk permits, was a qualified individual with a disability within the meaning of the ADA and RA.

104. Plaintiff, as an inmate at Stateville, was entitled to a bed and access to showers, meals and other facilities and accommodations.

105. Plaintiff was denied access to Stateville programs, activities, facilities and accommodations on the same basis as other inmates because of his disability.

106. Defendants Baldwin and Williams, acting in their official capacities, individually or together and under the color of law, perpetuated an official policy and widespread custom and practice whereby IDOC and Stateville employees fail or refuse to adequately comply with low gallery/low bunk permits and fail or refuse to reassign inmates to low galleries or low bunks in response to obvious medical needs.

107. As a direct result of this policy, custom and practice, Plaintiff was repeatedly denied access to a bed and other prison facilities on the same basis as other inmates.

108. Furthermore, while assigned to work in Stateville's barbershop, Plaintiff was entitled to report to work, perform his duties and receive compensation for his work but was denied these benefits or services because of his disability.

109. These denials caused Plaintiff pain and suffering, embarrassment and lost wages.

110.     These denials also amount to an independent violation of the Eighth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, insofar as they resulted from failures or refusals to honor Plaintiff's low gallery/low bunk permits or reassign him to low galleries or low bunks based on his obvious medical needs.

## COUNT III
### Deliberate Indifference To Serious Medical Need In Violation Of 42 U.S.C. § 1983
### (By Plaintiff Against Defendants Baldwin And Williams In Their Official Capacities)

111.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 110 above.

112.     Defendants Baldwin and Williams, acting in their official capacities, under the color of law, perpetuated an official policy and widespread custom and practice whereby IDOC employees deny inmates medical diagnosis or treatment -- regardless of the severity of the inmates' medical needs -- if the inmates are scheduled to be seen in the healthcare unit at a future date.

113.     Defendants Baldwin and Williams are, and at all relevant times were, aware of facts from which they could infer a substantial and obvious risk of serious harm to inmates as a result of this policy, custom and practice, and they disregarded that substantial and obvious risk by perpetuating the policy, custom and practice.

114.     As a result of this policy, custom and practice, Plaintiff was denied medical diagnosis or treatment after he was injured on April 28, 2013, despite his obvious and immediate need for medical care, because he was scheduled to be seen in the Stateville healthcare unit on April 30, 2013.

115.     This denial of medical care caused Plaintiff unnecessary, wanton and lasting pain.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests:

A.      A declaration that Defendants Baldwin and Williams, in their official capacities, have subjected Plaintiff to conditions of confinement, both individual and in aggregate, that deprive Plaintiff of his rights under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution;

B.      A declaration that Defendants Baldwin and Williams, in their official capacities, violated Title II of the ADA and Section 504 of the RA;

C.      An order that the Class Claim can be pursued on a class basis pursuant to the Court's powers under Federal Rule of Civil Procedure 23 and defining the class as described in Paragraph 87;

D.      A declaration that Defendants Baldwin and Williams, in their official capacities, have subjected Plaintiff and members of the proposed class to conditions of confinement, both individual and in aggregate, that deprive Plaintiff and members of the proposed class of their rights under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution;

E.      Compensatory damages arising from violations of Title II of the ADA and Section 504 of the RA by Defendants Baldwin and Williams;

F.      Injunctive relief arising from violations of Title II of the ADA, Section 504 of the RA, 42 U.S.C. § 1983 and the United States Constitution by Defendants Baldwin and Williams;

G.      Injunctive relief in favor of the proposed class arising from violations of 42 U.S.C. § 1983 and the United States Constitution by Defendants Baldwin and Williams;

H.      Costs, expenses and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205 and Section 794a of the RA; and

I.      Such further legal, equitable and other relief as this Court deems just and proper.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all claims asserted in the above Second Amended Complaint.

Dated: September 10, 2015                    Respectfully submitted,

                                             _/s/ Trevor K. Scheetz_____
                                             One of the Attorneys for
                                             Plaintiff Christopher Everett

Mark S. Mester
      mark.mester@lw.com
Kathleen P. Lally
      kathleen.lally@lw.com
Trevor K. Scheetz
      trevor.scheetz@lw.com
Robert D. Boley
      robert.boley@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois  60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

# EXHIBIT A



# John Howard Association of Illinois

375 East Chicago Avenue, Suite 529  Chicago, IL 60611
Tel. 312-503-6300 Fax. 312-503-6306 www.thejha.org

# Monitoring Visit to Stateville Correctional Center 2013

Stateville Correctional Center (Stateville) is located approximately 40 miles outside of Chicago in Joliet, IL. Stateville operates a maximum-security facility (max), a Minimum Security Unit (MSU), and the Northern Reception and Classification center (NRC), where 85 to 90 percent of all Illinois Department of Corrections (IDOC) inmates enter the system.[1] Stateville also manages and temporarily houses inmates on court and medical writs from other male IDOC facilities. This report addresses the max facility; however, many resources – including healthcare – are spread across the Stateville max, MSU, and NRC, and many conditions affect the entirety of Stateville.



**Vital Statistics:**
Population: 1,615
Rated Capacity: 978
Operational capacity: 1,693
Average Age: 31
Percentage of Population aged 50 or older: 22%
Average Annual Cost per Inmate (FY 2011): $28,870
Population by Race: 75% Black, 14.5% White, 10.5% Hispanic/Latino

*Source:* IDOC, April 2013

## Key Observations

- Physical plant issues continue to raise major concerns, particularly in the roundhouse, Unit F, which is the only panopticon still in use in the United States.

- Inmates' healthcare needs overwhelm Stateville where high demand is continually aggravated by insufficient resources, including key staffing vacancies.

- Although visitation has been demonstrated to both aid in facility management by promoting positive behavior and correlate to reduced recidivism, Stateville's visiting room physical space and hours are limited.

- Illinois' fiscal crisis had crippled the Illinois Correctional Industry programs at Stateville.

- Additional mailroom staff were needed to alleviate delays.

---

[1] The MSU is commonly referred to as "Stateville Farm" and inmates housed there have work assignments throughout Stateville in both the max and NRC. The latest monitoring report on NRC and MSU is available at http://thejha.org/NRC.

# Monitoring Visit to Stateville Correctional Center 2013

## Executive Summary

The primary problems noted in JHA's prior reports persist at Stateville's maximum-security facility.[2] Yet, as JHA's 2011 report stated: "Stateville's biggest challenges—severe overcrowding, understaffing, a grossly deteriorating physical plant, lack of education and inmate programming, and lack of resources to address these issues—are squarely beyond the control of the facility's staff and administration."[3]

The strain of continual overcrowding at NRC, where inmates regularly are sleeping in locations intended for other uses, directly impacts all of Stateville. In reviewing this draft in September 2013, IDOC officials stated that there had not been inmates sleeping in Stateville max's nonstandard housing locations since July 2013. However, JHA spoke with staff who stated that there are still regularly 200 to 300 inmates sleeping in such locations at NRC. More precisely, as of September 20th, 2013, there were 100 inmates awaiting transfer to boot camp housed in a gym, 35 inmates on the floor in the NRC healthcare unit, 90 inmates on the floor in NRC staging, and three in the MSU on the floor. Staff also expected that there would be even more inmates on the floor the following week based on lack of transfers out. IDOC officials responded that this expected increase was speculation. Staff stated that inmates have been sleeping in the gym for the past two years and in the staging area for the past eight months. Since the time of JHA's 2012 NRC monitoring visit, there are more than 100 additional inmates housed at Stateville.[4] IDOC officials stated that they see the inmates housed in nonstandard areas in the NRC as a transient situation because the same inmates are not housed in nonstandard areas for extended periods.

Nonetheless, the sharing of physical space and staffing resources with the overcrowded NRC further reduces already limited opportunities for Stateville max inmates.[5] Illinois' prison population is aging and many Stateville max inmates are serving 20 years to life. As IDOC faces

---

[2] This report is based on an April 4, 2013 monitoring visit and ongoing communications with inmates and staff. This report supplements JHA's previous monitoring reports, available at http://www.thejha.org/stateville. Stateville and IDOC administrators reviewed and fact-checked a draft of this report and it was last discussed with JHA on October 2, 2013. No factual substantive changes have been made since this time prior to publication. All statements of opinions and policy recommendations herein are JHA's unless otherwise stated. *See also* JHA's 2013 publication *How JHA's Prison Monitoring Works*, available at www.thejha.org/method.

[3] Available at http://www.thejha.org/stateville.

[4] Available at http://thejha.org/NRC.

[5] In addition to the burden of an infirmary shared with NRC, at the time of the visit, due to commissary shared with NRC, the max inmates had commissary services only every six to eight weeks. IDOC officials reported that since the visit with the addition of staff inmates are now offered commissary twice a month. Administrators reported that discussions continue on creating a separate NRC commissary. Additionally, inmates who have been in intake at NRC more than 60 days, which is increasingly common given limited available bed space throughout IDOC, must use the max visiting room, again limiting opportunities for other inmates. However, JHA reiterates our recommendation from the 2012 JHA NRC report that NRC segregation inmates also be permitted visitation after 60 days if not otherwise restricted (C Grade). IDOC officials report that a plan is being developed for NRC visitations at the NRC. JHA will continue to monitor these developments.

crowding throughout facilities, older inmates with long sentences, even those who have already served long terms and have had impeccable behavior, are unlikely to be transferred to other facilities that may be more suitable for their growing medical needs than a maximum-security environment.

Against this backdrop, this year Stateville administrators reported the greatest challenges for the facility remain accountability, fiscal resources, and staffing issues. JHA believes that the time for accountability for the crowding and physical plant crisis at Stateville is long overdue. For instance, Stateville has $84 million in deferred maintenance costs alone for the facility.[6]

Additionally, Illinois must take accountability for the state of its correctional healthcare system.[7] The United States Constitution's prohibition against cruel and unusual punishment requires prison officials to provide adequate healthcare for inmates. In a positive step towards this goal, Illinois House Resolution 57 calls for the National Commission on Correctional Health Care (NCCHC) to audit the IDOC healthcare system in response to JHA's recommendation for an independent entity audit.[8] However, Stateville has immediate needs. At the time of the visit, Stateville staff reported difficulty obtaining basic supplies,[9] while inmates file more medical grievances than any other category.[10]

Stateville houses medical writ inmates from all IDOC facilities who are being sent out to outside Northern hospitals, and the max facility's infirmary is also used to house infirmed NRC inmates who are just entering the IDOC system. These populations have greater than average medical needs.[11] Further, IDOC remains reliant on paper medical records, which makes transmissions of information between facilities and with outside care more difficult.

JHA and IDOC agree that implementing an electronic medical record system is vitally important. However, although the program was intended to be implemented system-wide by now, there are continued delays. JHA has yet to see any capacity in even a pilot location, and healthcare staff at

---

[6] To put this in perspective, $84 million is seven percent of IDOC's annual $1.2 billion budget. Some improvements have been initiated recently including a new locking system in X House and new fiber lines for updated radio equipment. Though the projects were not complete at the time of the 2013 visit, since the visit, IDOC reports that the radio system has been implemented.

[7] See JHA's 2012 healthcare report, *Unasked Questions, Unintended Consequences: Fifteen Findings and Recommendations on Illinois' Prison Healthcare System*, available at http://thejha.org/sites/default/files/Unasked%20Questions-Unintended%20Consequences.pdf.

[8] See Illinois House Resolution 57 (adopted May 22, 2013), available at http://www.ilga.gov/legislation/fulltext.asp?GAID=12&SessionID=85&GA=98&DocTypeID=HR&DocNum=57&LegID=72056&SpecSess=&Session. *See also*, Recommendation 1 of JHA's 2012 healthcare report, available at http://thejha.org/sites/default/files/Unasked%20Questions-Unintended%20Consequences.pdf.

[9] See further discussion of medical supply issues in the Healthcare section below. Other supply issues reported by administrators included burdensome ordering procedures for everyday items such as toilet paper, foam trays, paper napkins, clothing and cleaning items. However, since the visit, IDOC officials reported that ordering issues have been addressed by hiring a new Business Administrator and properly training others in the correct procedures for ordering supplies. JHA is pleased with this reported improvement and will continue to monitor the issue.

[10] See further discussion in Grievances and Healthcare sections below.

[11] For example, intake inmates may be experiencing illegal drug withdrawal if they enter the system as a parole violator, or withdrawal from prescription medication that will not be continued within IDOC. IDOC officials stated that medications are never discontinued due to cost, though they may be switched to generics. See further discussion in the Healthcare section below.

Stateville again noted the need for shelving for paper medical record storage.[12] The latest report from IDOC officials is that electronic medical records are planned to be piloted at just the two female correctional centers this fall. Stateville administrators promised that needed shelving for paper records will be installed at their facility by the end of this year. JHA will continue to monitor and advocate for implementing planned medical records improvements.

This report addresses the following: Grievances, Healthcare, Living Conditions, Programming and Industry, and Staffing.

## Recommendations

- JHA repeats our recommendation that IDOC must carefully monitor temperature and ventilation control and institute a strategic plan for improvements.

- JHA continues to recommend that IDOC improve the grievance procedure, including implementing a system for permitting inmates to retain a record of their grievance.

- JHA continues to recommend oversight for the IDOC healthcare system and corrected staffing levels.

- JHA continues to recommend that IDOC improve sharing of medical records to allow greater continuity of care; this is particularly important to facilitate efficient and timely outside specialist care.

- JHA recommends that Stateville expand visiting hours.

- JHA recommends a review of Illinois Correctional Industry operations to determine feasible goals given Illinois' fiscal crisis and the current needs of IDOC.

## Grievances

In the year prior to the visit, across all of Stateville there were 6,836 inmate grievances recorded. Healthcare complaints represented the largest category of grievances by a factor of two times as many grievances as any other category, representing about a third of the total grievances. The trends for healthcare grievances appeared to be continuing at the time of the visit in 2013, with a marked acceleration of grievances relating to outside medical screening or furloughs, typically used for specialist care. The next largest grievance categories were staff conduct, personal property, and cell conditions.[13]

---

[12] *See* Recommendation 2 of JHA's 2012 healthcare report, available at
http://thejha.org/sites/default/files/Unasked%20Questions-Unintended%20Consequences.pdf.
[13] Some such complaints relate to physical plant conditions discussed in the Living Conditions section below.

JHA cannot confirm or deny the validity of particular inmates' reports set forth herein.[14] Complaints presented are not presented as fact; rather they reflect common concerns and attitudes that JHA believes should be acknowledged and addressed.[15] IDOC is given the opportunity to review and respond for all monitoring reports prior to publication.

Inmates at Stateville, as at every IDOC facility JHA has visited, reported that grievances are not responded to in a timely manner. Some inmates expressed that they believe delays or missing grievances are purposeful, as a way of avoiding addressing certain issues, so that inmates' grievances will expire and have to be resubmitted for review.

In response to this report, IDOC officials denied such claims and reported that grievances have even been accepted outside required timeframes. Further, IDOC officials stated that anti-gang and other security measures, combined with required verification, could make it falsely appear that the process is delayed.

Grievances are required to be filed in a timely fashion and administrative remedies under the grievance system exhausted before an inmate can bring a legal claim.[16] Hence, if a grievance is lost or delayed, a legal claim may be precluded due to an inmate's failure to properly exhaust his administrative remedies. During the visit, staff confided that there was a backlog of approximately 700 medical grievances; examples of such concerns are discussed in the Healthcare section below. IDOC officials stated that since the visit, Stateville has improved the grievance process to being current within one week of filing and the backlog is being substantially reduced daily. JHA will continue to monitor this issue.

Grievance procedure also requires inmates to attempt to resolve issues through counselors as an initial step. However, several inmates reported that counselors are not responsive. Inmates complained that counselors on monthly rounds would quickly walk the gallery and refuse to engage with inmates. JHA has recommended increased hiring and training of counselors

---

[14] *See* JHA's 2013 publication *How JHA's Prison Monitoring Works*, "On a given prison visit, JHA interviews between 80-100 inmates. Our Prison Response Organizer also corresponds with more than 2,000 inmates and their loved ones every year through letters, phone calls, and emails. In these communications, JHA responds to requests for assistance, and we also record them in our database, which allows us to track particular issues by facility. Through these efforts, JHA is able to identify common issues and problems. … Research demonstrates this kind of information is vital to the operations of Illinois' prison system, as attitudes shape the culture of correctional facilities and can have wider implications for security. Including these perspectives in our reports provides IDOC with an important opportunity to respond and educate inmates about its policies and procedures, while it also shows inmates and their loved ones that JHA uses what we learn from them in our advocacy." Available at www.thejha.org/method. Inmates may send privileged mail to JHA, 375 E. Chicago Ave., Suite 529, Chicago, IL 60611.

[15] A study found that "the lowest levels of tension and violence seem to exist in facilities where staff clearly follow policies, where there is meaningful communication between prisoners and staff, and where prisoners feel respected. All of these qualities flow from good leadership." *Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons*, p. 23, available at
http://www.vera.org/sites/default/files/resources/downloads/Confronting_Confinement.pdf.

[16] *See* 20 Ill. Adm. Code 504.810, "Filing of Grievances," available at
http://www.ilga.gov/commission/jcar/admincode/020/020005040F08100R.html; and the Prison Litigation Reform Act, 42 U.S.C. § 1997e (2000), available at: http://www.law.cornell.edu/uscode/text/42/1997e.

throughout IDOC.[17] Stateville and NRC have 31 counselors for upwards of 3,900 inmates, actually making Stateville's counselor to inmate ratio better than that of many male IDOC facilities, though inmates reported that it is still dysfunctional. IDOC officials stated that counselors are responsive and do not refuse to engage with inmates. JHA will continue to monitor these issues and continues to recommend that counselors log contacts.

Other complaints related to staff conduct included: staff physical abuse of inmates; ignoring medical permits; retaliation and restriction of privileges based on an inmate's litigation; an allegation that an inmate would be double-celled with a known enemy as retribution; and harassment based on committing crime or classification. IDOC officials denied physical abuse by staff and state that retaliation and harassment is not tolerated. JHA encourages inmates to document and report all such instances so they can be investigated.

An effective inmate grievance system is a fundamental element of a functional prison system, as it is an important source of intelligence, promotes accountability and trust between inmates and staff, and demonstrates respect for procedure and the rule of law.[18] Given failures and delays observed with the grievances at Stateville, JHA again advocates for oversight for the IDOC healthcare system and recommends that IDOC improve the grievance procedure, including implementing a system for permitting inmates to retain a record of their grievance.[19]

## Healthcare

At the time of the visit, administrators reported that critical healthcare vacancies included a physician and a dentist, as well as 25 nursing positions and four Correctional Medical Technician (CMT) positions shared with NRC.[20] Since the visit, administrators reported that both the physician and dentist positions have been filled. Nursing shortages, as observed throughout IDOC's correctional healthcare system, are linked to greater stress and burnout for staff, and increased safety risks and medical errors for patients.[21] Administrators reported it would be

---

[17] *See e.g.*, JHA's 2013 Pontiac report, available at http://www.thejha.org/pontiac.

[18] *See e.g., Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons*, p. 92, available at http://www.vera.org/sites/default/files/resources/downloads/Confronting_Confinement.pdf.

[19] *See e.g.* JHA's 2012 healthcare report, Recommendations 1 and 14, available at http://thejha.org/sites/default/files/Unasked%20Questions-Unintended%20Consequences.pdf.

[20] At the time of the visit, although authorized for four physicians and four physician assistants, Stateville had just two physicians and three physician assistants. NRC also lacked a medical director and physician assistant, while the NRC Director of Nursing (DON) and nurse supervisors were on leaves of absence. State healthcare positions at Stateville include the Healthcare Unit Administrator (HCUA), pharmacy technician, two dentists, a dental assistant, nurses, the DON, and a nursing supervisor. Contractor Wexford Health Sources (Wexford) positions include physical therapy (physical therapist for eight hours and physical therapy assistant for 16 house per week), nursing, psychiatry, physicians, physician assistants, and NaphCare-dialysis. Administrators reported that minimum staffing for both Stateville and NRC is in total 56 nurses and 27 CMTs. Stateville max had only 29 registered nurses (RNs) and 12 licensed practical nurses (LPNs) for a total of 1,600 hours of coverage instead of the authorized 2,195. There were only 14 of 18 authorized CMTs for the max facility coverage. Stateville has a pharmacist for four hours a month, two pharmacy technicians for 75 hours a week, three full time lab technicians, and an optometrist for 56 hours a month. Stateville has five dentists for 153.5 hours of coverage and four dental assistants for 117.5 hours weekly. At the time of the visit six nurses, six CMTs, and a dental assistant were on leaves of absence.

[21] *See* U.S. Department of Health and Human Services, Agency for Healthcare Research and Quality Patient Safety Network, *Nursing and Patient Safety*, available at http://psnet.ahrq.gov/primer.aspx?primerID=22.

helpful for them to have separate Stateville max and NRC medical staff, but ideally total staffing would be increased to 72 nursing positions with additional certified nursing assistants for the infirmaries. Nonetheless, IDOC officials clarified that all operational requirements are currently filled with overtime and all medical posts are covered. JHA will continue to monitor these staffing issues.

Stateville max has 30 hours of psychiatry coverage weekly. Additional mental health staff includes four psychologists, four mental health professionals, and one social worker. The average caseload of a mental health staff member was reported to be 95 inmates. There was a backlog of 135 inmates waiting for receive non-emergent mental health care. At the time of the visit, there were 291 inmates receiving psychiatric care with 121 on psychotropic medication, two involuntarily. Eleven of the 78 inmates in segregation were receiving mental health treatment.

JHA believes that staff need to take a more proactive approach to identifying mental health issues at Stateville, as several inmates interviewed, particularly in segregation in the roundhouse, expressed that they were having difficulties. Some inmates complained that they are taken off particular mental health medications at the facility. IDOC officials responded that such decisions are made solely by doctors, not unqualified staff, and side-effects are considered. Further, IDOC officials stated that there is an ongoing issue with many mental health patients in society, not just in prisons, choosing not to take their medications. JHA recommends increasing mental health staffing at this facility and throughout IDOC.[22]

Stateville's infirmary accommodates inmates with many different security classifications, so managing the area is complicated. At the time of the visit, there were 23 inmates housed in the max infirmary, which has the capacity to house 32. Five of those inmates were terminally ill. There were 13 deaths at Stateville max in the prior five years, two of which were suicides. In the past year there had been 105 instances of suicide watch. At the time of the visit, there were two inmates on hunger strikes. JHA interviewed an inmate who had recently been on a hunger strike without success; he stated he was attempting to receive medical and mental health treatment.

During the visit to the infirmary, JHA visitors had concerns about the lack of direct supervision in the crowded medical bullpen, where only segregation inmates were handcuffed. However, administrators stated that during day shift, there are two officers assigned to the area and one in the infirmary. One inmate interviewed stated that he had come to the infirmary for a medical emergency with a ripped out catheter and had been waiting over two hours. IDOC officials denied this occurred. Inmates reported instances of waiting as long as nine hours. IDOC officials stated they have no record of a nine-hour wait for any inmate in the medical bullpen. JHA has received several complaints from inmates housed in the infirmary that the rooms are unsanitary and that staff neglected them. IDOC officials responded that rooms are cleaned daily and after each use. JHA visitors felt that during the visit a particular contractor Wexford Health Sources (Wexford) administrator, though undoubtedly overwhelmed by the medical demand at the facility, expressed disdain for inmates and was likely not putting personal feelings aside in

---

[22] *See e.g.*, JHA's 2012 healthcare report, Recommendation 8, available at
http://thejha.org/sites/default/files/Unasked%20Questions-Unintended%20Consequences.pdf.

professional treatment of patients. IDOC officials responded that if that is ever the case, it is not tolerated by IDOC, and would be immediately addressed. JHA will continue to monitor such issues and encourage professional and respectful conduct. The fact that an inmate might not receive any healthcare elsewhere does not relieve Illinois of its constitutional responsibility.

Other healthcare staff expressed considerable concern for professional treatment of inmates. JHA received the following reports privately from healthcare staff, from both state and Wexford employees, which was consistent with information received from inmates and other sources. Several staff are concerned that they receive no specialized training and are not provided with guidelines. IDOC officials responded that all staff are licensed, trained, and go through orientation and pre-service orientation training. Staff expressed to JHA that they believe fear of litigation causes many things to go undocumented. They reported that they are discouraged by Wexford administrators from ordering certain medications and supplies due to cost. IDOC officials stated that IDOC staff and supervisory personnel do not discourage the ordering or administering of any necessary medication. Staff reported that basic items such as gloves are rationed, so they will work with just one. IDOC officials deny gloves are rationed. In many cases, staff reported to JHA that they feel that contractor Wexford does not support a physician's or other provider's medical judgments. IDOC officials responded that all decisions are supported within the parameters of a correctional setting, and that whatever is necessary and physically possible is done. JHA will continue to monitor and report on these issues.

At the time of the visit, administrators reported that needed medical equipment and supplies included: (1) record keeping items — computers, a fax machine, a paperless chart system, medical charts, shelving for medical records; (2) necessary infirmary items — hospital beds, mattresses, wheelchairs,[23] a blood pressure machine, a portable pulse oxygen meter, IV poles, weight scales, shower chairs; and (3) dental and optometry equipment — a slit lamp, four dental chairs, four lights, four units, two sterilizers, a x-ray developer, a high evacuation system, and an ultrasonic cleaner. During the visit, a dentist proudly showed JHA visitors some newly received equipment that should permit some additional treatment going forward. At the time of the visit, there was a four-month wait for fillings and two weeks for extractions.[24] IDOC officials reported that since the visit needed equipment has been ordered, noting that the new Assistant Warden of Program's background in healthcare administration has had a positive impact. JHA is pleased with these responses and will continue to monitor the situation.

Although Stateville reported 13,352 sick call visits for 2012, some inmates reported that they had not seen healthcare staff because sick call requests were ignored, with reports of no response in more than two months.[25] IDOC officials denied that sick calls are ignored noting that medical

---

[23] In accord with this need, one inmate reported that he had to hop to healthcare, to the amusement of staff, because there was no wheelchair available.

[24] In the past year, 1,162 extractions and 1,623 fillings were completed

[25] One inmate, who reported he made several requests and received no response, stated he recently had open-heart surgery, had a staph infection, and needed blood pressure medication. Another inmate reported that he had difficulty seeing healthcare staff on his housing unit and passed out prior to being sent to the infirmary, where he had to pay a $5 copay and was just given acetaminophen. As stated in prior reports, JHA opposes correctional copays, given the evidence that they unduly restrict inmates' access to healthcare, jeopardizing the health of inmates, staff, and the public. *See* JHA's 2012 healthcare report, Recommendation 5, available at http://thejha.org/sites/default/files/Unasked%20Questions-Unintended%20Consequences.pdf. *See also*, National

teams make rounds daily; hence, a wait of "more than two months" would be highly unusual. They acknowledged that delays may occur, but stated that emergent cases never wait.

JHA received several complaints from inmates who had transferred into Stateville from other facilities without being reevaluated or getting medications and prescriptions continued. Administrators confirmed that this does at times accidentally occur, which points again to the need for better a better recordkeeping mechanism. Inmates also reported that they are not allowed to submit refill and medical permit requests early enough to ensure continuous treatment at Stateville.[26] IDOC officials explained that often patients must be reevaluated before their prescriptions can be refilled and inmates do not want to wait for this normal procedure. IDOC officials also stated that there are documented cases of inmates claiming to have not been seen who actually were seen. IDOC officials further wished to note that JHA cannot confirm or deny the validity of particular inmates' reports. JHA will continue to monitor such issues and encourages inmates to clearly document their concerns.

Inmates reported that physicians are frequently not at the facility and appointments are cancelled. IDOC officials reported that since the visit, daily nurse sick call is now held in the housing units, which should eliminate waits and free up the physicians to see only those requiring physician attention. Outside appointments are also often canceled or delayed. In addition to scheduling issues, lockdowns also cause appointments to be canceled. Stateville had 88 days of lockdown in the prior year.[27] JHA finds the policy of canceling all healthcare appointments due to lockdown untenable and again recommends this be reconsidered.[28] In one documented example, a "one week" follow-up appointment actually occurred 12 weeks later and a pending specialist appointment had not occurred in more than four months. Several inmates reported never receiving follow-up appointments with both in-facility staff and specialists. JHA believes that this is also an area where electronic recordkeeping would be helpful.

Commission on Correctional Heath Care, *Position Statement: Charging Inmates a Fee for Health Care Services* (October 2005), available at http://www.ncchc.org/charging-inmates-a-fee-for-health-care-services.

[26] JHA interviewed an inmate who stated he had a blood clot in his leg and continuously tried to get treatment. Eventually he was sent to University of Illinois, Chicago (UIC) specialist and was returned to Stateville with medication and prescriptions that needed to be refilled. However, he did not get a refill and the inmate relapsed and had difficulty walking and communicating. His cellmate wrote to the UIC doctor, who then requested the inmate be brought back to UIC for further treatment and held there for the remainder of his recuperation to ensure proper treatment. IDOC officials reported that they were not notified by inmate of this alleged incident. They note that the onsite Wexford medical director is the primary doctor who has final authority over all treatment regimens.

[27] In comparison Pontiac Correctional Center and Menard Correctional Center, IDOC's other male maximum-security facilities, reported six and 251 days of lockdown respectively. However, Pontiac inmates have very little movement to begin with, as Pontiac is primarily used for long-term segregation. JHA reports on these facilities are available at http://thejha.org.

[28] *See* JHA's 2012 Menard report, available at http://thejha.org/menard.

At the time of the visit, due to the lack of a physician, there was a backlog for the chronic care clinics other than Hepatitis C and HIV clinics, which are provided through Telemed. Staff and administrators at Stateville considered Telemed an asset, as it is does not require waiting for specialist appointments, nor does it incur additional security and transportation costs. IDOC officials reported that since the visit, the clinical backlog has dramatically improved, noting that as of September 1, 2013, there were only 56 hypertension and 18 diabetic cases waiting, while all other backlogs have been cleared. JHA hopes that Stateville will remain on the path of continued improvement.

| Number of Stateville Inmates Diagnosed[29] | |
|---|---|
| Asthma | 158 |
| Cancer | 20 |
| Diabetes (Type 1) | 105 (2) |
| Hepatitis C | 83 |
| HIV | 14 |
| Hypertension | 404 |
| Seizure | 26 |
| General Medical | 92 |

At the time of the visit, 352 inmates were older than 50 years old and 74 inmates were identified as having a disability. JHA commends Stateville for offering a separate recreation time for inmates with special needs. Many healthcare complaints JHA received related to conditions of an older population, including things like requests for lower bunk permits. IDOC officials noted that while they will grant bottom bunk requests when appropriate, they do not grant bottom gallery requests. JHA recommends that IDOC continue to plan for accommodation of the needs of Illinois' aging prison population, as discussed in JHA's 2013 Dixon report.[30]

Additionally, JHA interviewed and corresponded with deaf and hearing-impaired inmates who reported difficulties at Stateville. Issues reported ranged from inability to get hearing aid batteries and depression, to receiving segregation time for failing to hear an order and safety concerns related to being unable to hear. IDOC officials stated that battery replacement has a weekly schedule and that batteries can be furnished as needed outside the schedule. They also stressed that segregation is not automatic, and that there is a review process in which hearing difficulties, when proven, are considered. JHA again recommends that IDOC ensure adequate means of communication for deaf and hearing-impaired inmates.[31] IDOC officials reported that they do ensure this, in part through two onsite certified sign-language interpreters and video interpretation. JHA will continue to monitor this issue.

Other inmates with disabilities at Stateville reported instances of neglect including not receiving sufficient diapers for incontinence issues and mobility issues where they were not getting consistent accommodations to be taken to chow hall or showers. Stateville administrators reported they had addressed particular instances that JHA raised to their attention.

---

[29] Data provided by Stateville administrators from April 2013.
[30] Available at http://thejha.org/dixon.
[31] Healthcare via Telemed can provide sign language interpretation. At the time of the visit, administrators were considering the possibility of adding sign language interpretation for religious services. Since the visit, administrators reported that the issue of sign language for religious services is being addressed by the Americans with Disabilities Act (ADA) Coordinator and others. Officials report they will review the same program at Big Muddy River Correctional Center for possible implementation at Stateville. See also, JHA's 2013 Big Muddy report and 2012 NRC report, available at http://thejha.org.

## Living Conditions

Stateville max inmates typically are double-celled and may leave their cells for work or school assignments if applicable,[32] visits,[33] medical passes, law library, chow, or twice weekly two-and-a-half-hour recreation periods.[34] Like other maximum IDOC facilities, Stateville offers little in formal educational or vocational opportunity for max inmates, with fewer than five percent of the population participating at the time of the visit.[35]

IDOC officials noted that the Stateville offerings meet all agency policies, which reflect State of Illinois laws. Since the visit, administrators reported that educational course offerings have been increased and the barber program is pending State of Illinois licensing.[36] JHA commends these positive developments and encourages IDOC to continue to strive for more than the legally required minimum across the board. We note that in approximately six months since JHA's 2013 visit, Stateville administrators reportedly have been capable of making several substantial improvements, notably with some of JHA's longstanding concerns regarding mixed populations in the roundhouse.

At the time of the visit, the roundhouse or Unit F, housed disciplinary or administrative segregation,[37] orientation, general population overflow, inmates on court and medical writs, protective custody inmates, and inmates requiring single-celled status including non-compliant mental health inmates and inmates classified as either predators or vulnerables.[38] As noted in prior JHA reports, housing so many different populations together is problematic. It is inadvisable for inmates with protective custody status to intermingle with others, and in the roundhouse, though the populations were housed on different levels, these inmates may encounter inmates in disciplinary segregation and inmates from another facility at Stateville on a writ. Further, the design of the roundhouse panopticon is intended to enable lines of sight.

Administrators reported that since the visit Unit F has been realigned. They stated currently there are three types of population housed in Unit F: segregation, general population, and overflow status. Administrative detention and protective custody inmates have been relocated to Unit X.

---

[32] At the time of the visit there were about 250 inmates with work assignments and 60 inmates in educational programming, meaning that about 80% of the population had neither.

[33] General population inmates are permitted a maximum of five two-hour visits a month (with one weekend visit and longer visits for those who travel far distances), for more information on visitation see http://www2.illinois.gov/idoc/facilities/Pages/statevillecorrectionalcenter.aspx.

[34] Those housed in Unit F or the infirmary have only one recreation period weekly.

[35] *See* Programming and Industry section below.

[36] *See* further discussion in the Programming and Industry section below.

[37] Notably Stateville's segregation population was down to 78 from 137 at the time of the 2011 visit. The average length of time in segregation at Stateville reported by administrators in 2013 was 4.1 years, compared to 13 months reported at the time of the 2011 visit. Stateville uses a modified Long Term Segregation Incentive Program, to give inmates an opportunity to reduce their segregation time. Administrators report that a committee reviews long term segregation placements monthly and that as of September 1, 2013 six inmates were active in the program. At the time of the 2013 visit, 11 of the 78 inmates in segregation were receiving mental health treatment. For more information about IDOC use of segregation reduction techniques see JHA's 2013 Pontiac report, available at http://www.thejha.org/pontiac.

[38] At the time of the visit, Unit F housed 78 segregation inmates (out of a capacity of 134), 12 inmates on writs, 61 protective custody inmates, and 35 single-celled inmates.

Administrators reported that this move allows the facility to better manage their population to include services provided to those with special mental health needs, such as those with predator or vulnerable classifications.

During the visit, JHA observed deterioration and lack of upkeep in many parts of the max facility. The covered walkways showed years of paint shed in chips. Several buildings on the grounds have been condemned and closed. Inmates at Stateville complained that the water is discolored and has a strange taste.[39] At the time of the visit, Stateville administrators reported a need for some physical plant water line repair, which has since been completed. However, they stated that all water reports including the annual drinking water quality report were in complete compliance with the Environmental Protection Agency standards and regulations and that water is tested by an outside agency, Aero Lab. Inmate reports of bird, rodent, cockroach, and spider infestations were common and credible. Since the visit, the exterminator contract has been expanded.

JHA visitors found Unit F to be in particularly poor condition, noting peeling paint,[40] water leaks, and mold. Inmates complained of insufficient cleaning supplies and of the plumbing in the building, which requires a ten-minute toilet flush delay. IDOC officials stressed that the ten-minute flush is a timer system to avoid some inmates intentionally flooding cells. Again, inmates reported cockroaches were impossible to get rid of and swarmed their cells at night, even getting in their ears and wound dressings. Administrators responded, as noted above, that since the visit they had reviewed the pest control contract and would be changing the insecticide spraying schedule and locations. JHA believes this is a positive step; yet given that this is a longstanding issue, we still have concerns.

JHA received reports from several inmates that they had particular concerns about double-celling in Unit F. We also received reports that previously a mental health staff member helped facilitate appropriate assignments, but this individual had resigned. JHA interviewed several inmates in Unit F who appeared desperate for assistance, including some inmates who appeared to be hallucinating. Other inmates expressed fear of assault, depression, suicidal thoughts, and some seemed particularly suspicious and paranoid. Poor physical plant conditions, including extreme temperature and terrible acoustics, likely make inmates more uncomfortable, and these inmates may be less likely to sleep, due to fear of cellmates or cockroaches, adding to instability. Administrators stated that inmates housed in Unit F are routinely seen by mental health staff and crisis team members are on all shifts, seven days a week. Further, IDOC officials reported that the realignment of Unit F has permitted a quieter atmosphere and more privacy for treatment.

Cells with Plexiglas coverings are typically difficult to see and communicate through, but in Unit F, JHA visitors observed in some such cells a layer debris trapped in the door fronts that needed cleaning. Administrators stated that cleaning supplies are available upon request and regular cleaning schedules are followed. Inmates in Plexiglas fronted cells also expressed concerns about temperature and ventilation, which are issues throughout the facility. JHA repeats our recommendation that IDOC must carefully monitor temperature and ventilation control, and

---

[39] Correspondingly, inmates complained of limits on drinking water that could be purchased on commissary.
[40] Administrators noted that a staff painter was hired in March 2013.

institute a strategic plan for improvements. Administrators reported that since the visit, three large wall-mounted fans were installed in Unit F.

A fault at many IDOC's antiquated facilities is that heat is either on or off. During the visit, this was noted in the non-contact visiting area, which was very hot. Inmates also complained that they are not able to effectively regulate temperature and ventilation through use of windows, some of which were broken. Given the lack of control over heat, JHA could not understand why the facility had to collect inmate jackets at a set time, given the unseasonable low temperatures in late Spring this year after the heat was turned off. IDOC officials stated that this was strictly for a one-time inventory and replacement of worn-out jackets, noting that after a warm March, April was unusually cold.

JHA receives many complaints about apparel cleanliness and availability throughout IDOC, but at Stateville and NRC we have observed numerous inmates with clothing and shoes that were literally falling off. Additionally, we observed dirty mattresses and torn sheets.

JHA visited the dietary area. Fried chicken was being prepared. There were several apparent issues in the kitchen, including needed plumbing repairs and an inmate worker was doing some repair inside a large oven. We noted deteriorating flooring and built up debris trapped in various corners, likely blown in through vents. Inmate workers complained of rodents and droppings, stating that they only had glue boards to combat mice. IDOC officials responded that poison is not permitted in food preparation areas for sanitary reasons and that "snap" traps were eliminated when inmates stole them to make weapons, later discovered in routine searches of cells.

Other inmates complained about dietary sanitary practices, unclean food trays, not getting as much food as in the past, getting spoiled food, cold food, high soy content, no variety, and no fresh produce. IDOC officials wished to note that JHA cannot confirm or deny the validity of particular inmates' reports. They deny that Stateville serves spoiled food and that the menu lacks variety. IDOC officials stated that adult males of low to moderate activity, such as inmates, require approximately 2,000 calories per day and IDOC inmates get that daily. They also explained that IDOC bologna is not the reddish color most people are accustomed to due to the fact that it contains no chemical red dye. Stateville has six gardens and administrators reported that produce from the gardens is utilized in the facility. JHA recommends that the facility continue to expand this self-sustaining initiative. Further, we continue to recommend that IDOC and Stateville consider evidence on the impact of diet, particularly the negative impact of processed foods, on health and facility management.[41] IDOC officials noted that they have a dietician on staff at Stateville and stated that fresh fruit is part of the Statewide Department Master Menu.

Stateville runs three library sessions per day with 30 inmates per session for a period of two hours. Inmates reported it was difficult to get to the library and there was a long waitlist. There are 10 inmate law clerks, two paralegal assistants, and a library manager. Some inmates reported that they must pay others with commissary for help with legal work. Inmates reported that books

---

[41] *See e.g.*, JHA's 2012 healthcare report, Recommendation 4, available at
http://thejha.org/sites/default/files/Unasked%20Questions-Unintended%20Consequences.pdf.

and forms needed updates. However, paralegals have access to electronic legal resources. Several inmates reported that the typewriters in the library had no ink.[42] Administrators reported this was corrected after the visit. JHA also noted that the library was in need of repairs, including painting and fixes for roof leaks.

Contact with the outside world through phones, visits, and mail, are vitally important for inmate wellbeing,[43] particularly where activities are as limited as at IDOC maximum-security facilities.[44] Due to the proximity of Stateville to Chicago, where most inmates' families reside, this is a heavily visited facility. Nonetheless, visiting hours are limited to only 7:30 am to 2:30 pm daily. JHA recommends that Stateville expand visiting hours. IDOC reports that these hours are limited due to security concerns. Stateville has an extremely problematic visiting room, which is accessed by stairs, small for the population,[45] can become extremely loud, and has seating configured for security purposes so the inmate's seat is awkwardly elevated above those of the visitors.[46] Visitors with disabilities may be able to arrange to use the attorney visitation rooms if they are not in use. IDOC officials note that available space is determined by security requirements. JHA received a few reports that staff were reluctant to guarantee or schedule special visitation. JHA has also received reports of visitors being treated disrespectfully to discourage visitation. IDOC officials deny that staff discourage visitation and stated that occasionally visitors violate security and other rules upon arrival and must be turned away. However, they report that all allegations of rudeness are investigated.

## Programming and Industry

At the time of the visit, there were two Adult Basic Education (ABE) classes with 30 students enrolled and 87 on the waitlist. 25 inmates were enrolled in the General Education Development (GED) class, with 42 on the waitlist. In the latest available data, 17 inmates obtained ABE and 11 obtained GED in the prior year. Stateville offered a 1,500-hour barbering vocational program with five participants.[47]

Due to other prison closures, Stateville has acquired additional educators and at the time of the visit, administrators stated they planned to offer additional GED and ABE classes. Since the visit, administrators reported that educators and classes have been added in each category and

---

[42] In 2012 all personal typewriters were confiscated from inmates in maximum-security facilities due to IDOC determining that inmates were weaponizing typewriter parts. *See* JHA 2012 Menard report, available at http://www.thejha.org/menard.

[43] *See e.g.*, "Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons," p. 35-37, available at: http://www.vera.org/sites/default/files/resources/downloads/Confronting_Confinement.pdf.

[44] JHA commonly receives complaints from Stateville inmates that they do not even have writing instruments and they can be completely cut off from the outside world if they have restricted phone and visitation status.

[45] Stateville can accommodate a maximum of 33 general population, 20 NRC, four ADA or special visits, as well as non-contact visits, at once.

[46] One reason for this is so that items cannot be passed underneath the table; however, inmates are searched before and after visits and this seating arrangement precaution is not used at other IDOC facilities.

[47] *See also,* IDOC's April 2013 Quarterly Report, available at http://www2.illinois.gov/idoc/reportsandstatistics/Documents/IDOC_Quarterly%20Report_Apr_%202013.pdf.

participation has doubled.[48] In general, since the visit, administrators report that program staff
has been greatly increased. JHA commends this development.

Several inmates interviewed during the visit complained that there are no programs to help
rehabilitate them and nothing to prepare them for outside world. IDOC officials noted that
"Parole School" classes begin six months prior to release. Inmates who had GEDs or high school
diplomas wished there was some further education or programming, and complained that all
activities are "geared to the lowest common dominator." A few inmates particularly requested
more religious services, noting church was reduced to only once a month. IDOC officials
reported this was not the case, and that church services are seven days per week. JHA will
continue to monitor this issue.

JHA received several complaints about the lack of treatment for sex offenders at Stateville.[49] Sex
offenders who receive treatment generally have lower rates of recidivism than those who do not,
yet such programs remain scarce in IDOC.[50] While IDOC officials say that such programs are
"somewhat limited," JHA believes that having no more than at most few hundred treatment spots
and a few devoted staff members across the agency for the nearly 8,000 IDOC inmates labeled as
sex offenders, is inadequate to meet the needs of the population, most of whom will eventually
return to society.[51] At the time of the visit, Stateville housed 318 sex offenders with no special
programming for that population.[52] To quote a letter from one such inmate: "Yes I have a sex
problem ... I want to get help before I go home."[53] Since the visit, administrators reported they
now house 307 sex offenders. JHA is hopeful that the planned implementation of the new Risks
Assets Needs Assessment (RANA) screening tool will lead to more inmates receiving needed
services while incarcerated.[54]

---

[48] The July 2013 IDOC Quarterly report reflects that 144 Stateville inmates were being served in educational or
vocational programming, compared to 60 in April 2013. Quarterly reports available at
http://www2.illinois.gov/idoc/reportsandstatistics/Pages/QuarterlyReports.aspx.
[49] The Stateville inmate orientation manual states: "Modern and contemporary sex offender treatment is available
within the Department of Corrections in conjunction with Clinical Services. In accordance with Departmental
policy, the Mental Health Department will contact each sex offender incarcerated at Stateville to explain treatment
available at other institutions." However, many individuals at Stateville will be ineligible for transfer to the few
lower security facilities where treatment is offered.
[50] See e.g. Congressional Research Service (CRC) Report for Congress, *Civil Commitment of Sexually Dangerous
Persons*, p. 18–19 (July 2, 2007), available at http://www.policyarchive.org/handle/10207/bitstreams/18628.pdf; R.
Karl Hanson, et. al., *A Meta-Analysis of the Effective of Treatment for Sexual Offenders: Risk, Need, and
Responsivity,* (2009), available at https://www.ncjrs.gov/App/Publications/Abstract.aspx?id=260177.
[51] See discussions of sex offender treatment and related staffing issues within IDOC in JHA's 2013 Big Muddy
report and forthcoming 2013 Graham report, available at http://thejha.org/publications.
[52] Six inmates had been approved for release but were not released because of lacking appropriate placement. IDOC
officials note that they do not control host-site availability and that this is a community issue. For further discussion
of this reentry issue see JHA's 2013 Big Muddy report, available at http://thejha.org/bigmuddy.
[53] JHA encourages inmates to report any instance of sexual assault in prison. The Prison Rape Elimination Act
(PREA) mandates zero tolerance. Inmates may call the IDOC PREA report line, report by submitting a request slip,
a grievance, telling a trusted staff member, or asking a family member or friend to call the IDOC report line, 217-
558-4013. Inmates may make anonymous reports through JHA. For more information about PREA see
http://www.prearesourcecenter.org/, and for further information about IDOC policy see IDOC's PREA webpage, at
http://www2.illinois.gov/idoc/programs/pages/prisonrapeeliminationactof2003.aspx.
[54] See JHA's report *Reforming Illinois' Prison System from the Inside Out*, available at http://www.thejha.org/rrp.

Inmates also wanted programming addressing coping skills for those with long sentences. JHA continues to recommend expansion of mental health staffing and programming, including offering more group and individual therapy, particularly for inmates with sex offenses and inmates who will need coping skills for long sentences.[55] JHA commends Stateville for offering group counseling for substance abuse issues through the New Directions program, with 29 max inmates participating. Stateville administrators reported they are currently reviewing strategies to address these areas.

Due to proximity to Chicago, Stateville benefits from several volunteer programs. These include: art, poetry, creative writing, a restorative justice class taught by a professor from DePaul and including college students as well as inmates, and a Friday Speakers Series. Administrators stated that scheduling, staffing, and physical space considerations make it challenging to add additional programs. During the visit, many inmates interviewed were unaware of volunteer program opportunities, likely due to the fact that participation is limited. IDOC officials responded that inmates need to take some personal responsibility and learn of program availability. JHA commends Stateville for their use of volunteers and recommends the continued expansion and publicity of these programs. Administrators noted particular volunteer needs included proctors to monitor testing of inmates who take correspondence courses and English as a Second Language (ESL) teachers.[56] The IDOC procedure for volunteer clearance can be lengthy.

There are 252 maximum-security inmates with job assignments out of 290 possible assignments. While some inmates felt that to get a job assignment you had to snitch, the eligibility requirements are that the inmate must have: for the prior five years, no tickets for assaults, drugs, or weapons; for the prior two years, no segregation terms; and no previous removal for discipline from an assignment. Inmates are given one-year work assignments.

Illinois Correctional Industries (ICI) work assignments are typically the best paid and most sought after jobs at IDOC facilities.[57] Stateville's industry at the time of the visit employed just 11 inmates in the furniture shop and 10 inmates in soap manufacturing. Formerly, more than a hundred inmates were employed in this vast ICI area. ICI supervisors stated that there were no new orders coming in and ICI does not solicit any business outside of Illinois-governmental entities. While ICI would like to hire more inmate workers, doing so would require having more orders and would add the expense of more staff.

At every IDOC facility JHA visits, inmates complain that they have insufficient cleaning supplies while ICI produces such items.[58] IDOC officials stated that cleaning supplies are controlled substances and, for security reasons, are issued in small amounts only at inmate request, while cell units are cleaned weekly. During the visit to Stateville's industry facility we learned from staff that Illinois has been so behind on vendor payments that ICI has had difficulty

---

[55] For more information about sex offender treatment see JHA's 2013 Big Muddy report, available at http://thejha.org.
[56] JHA encourages anyone interested in these opportunities to contact the Stateville Assistant Warden of Programs.
[57] For more information see http://www.icicatalog.illinois.gov/.
[58] Similarly, it is difficult to understand the disrepair of clothing throughout IDOC when ICI also manufactures these items at other facilities.

getting necessary raw materials. IDOC officials stated that working with various vendors and through other procedures, ICI does have necessary raw materials.

Historically, ICI was developed to prepare inmates for life upon release, to support life while incarcerated (through farming, food production, clothing, etc.), and in some cases to be profitable. All of these are noble goals. However, JHA believes ICI needs to determine feasible goals given Illinois' fiscal crisis and the current needs of IDOC. ICI has shown an ability to adapt, notably with recent ramping up of recycling programs.[59] Given that profit through selling particular items, such as office furniture, to outside entities does not currently appear successful, JHA believes ICI through inmate workers should refocus on rehabilitation of IDOC facilities while providing inmates with work skills for reentry success and improving inmates' quality of life.[60]

In reviewing this draft, IDOC officials stated that ICI will soon introduce a recycling program employing 56 inmates at Stateville, also noting that this program will save on waste removal fees. JHA commends this planned adaptation.

## Staffing

At the time of the 2013 visit, Stateville employed 1,147 staff, of whom 373 were female. The racial make-up of the staff was 57 percent Black, 34 percent White, eight percent Hispanic/Latino, and one percent Asian. This staff represents the most diversity that JHA has observed at any

| Stateville Staff | Authorized | Actual |
|---|---|---|
| Major | 12 | 9 |
| Lieutenant | 57 | 54 |
| Sergeant | 60 | 55 |
| Correctional Officer | 734 | 771 |
| Correctional Counselor | 28 | 31 |
| Clerical/Administrative | 156 | 157 |

IDOC facility. Unlike most IDOC facilities, Stateville benefits from having several bilingual staff members with a variety of languages.

In April 2013, 65 security staff members and eight clerical/administrative staff members were on leaves of absence. Seven security staff were redirected to clerical or administrative duties. Out of five authorized mailroom staff, Stateville was operating with just two, and administrators reported a four-day backlog. Some inmates reported legal mail delays. Administrators noted an increase of clerical staff due to inheriting staff from recent closures of other correctional facilities; however, they stated that additional staff is still needed for mailroom and timekeeping.[61]

### ###

---

[59] *See e.g.* recent news article about ICI taking over recycling at the State Fair, available at http://www.sj-r.com/thedome/x1806125816/Correctional-Industries-to-take-over-recycling-at-state-fair.

[60] *See* 730 ILCS 5/3-12-2, Correctional Employment Programs, Types of Employment, which provides that ICI can employ inmates for a wide variety of functions including maintenance of IDOC buildings and properties, or production of necessities for IDOC programs. Available at http://www.ilga.gov/legislation/ilcs/ilcs4.asp?DocName=073000050HCh.+III+Art.+12&ActID=1999&ChapterID=55&SeqStart=13000000&SeqEnd=14900000.

[61] JHA also notes that instituting several improvements we recommend, such as increasing visitation and volunteer run programs, will necessitate greater security staffing or changes to staffing to permit more facility activity at times other than first shift (7 am to 3 pm).

*This report was written by Gwyneth Troyer, Director of JHA's Prison Monitor Project. Gwyn can be reached at (312) 503-6304 or* <u>gtroyer@thejha.org</u>.

Inmates may send privileged mail to JHA, 375 E. Chicago Ave., Suite 529, Chicago, IL 60611.

Contributors to this report include: Phil Whittington, JHA staff member; Aviva Futorian, JHA board member; Dylan Hood and Brooke Monea, JHA interns; and citizen volunteers, Pamela Gretza, Scott Main, Richard Pitts, and Amanda Winters.

Since 1901, JHA has provided public oversight of Illinois' juvenile and adult correctional facilities. Every year, JHA staff and trained volunteers inspect prisons, jails and detention centers throughout the state. Based on these inspections, JHA regularly issues reports that are instrumental in improving prison conditions.



JHA's work on healthcare in DOC is made possible through a generous grant by the Michael Reese Health Trust.

# **<u>EXHIBIT B</u>**

# Final Report of the Court Appointed Expert

# Lippert v. Godinez

December 2014

Prepared by the Medical Investigation Team

Ron Shansky, MD
Karen Saylor, MD
Larry Hewitt, RN
Karl Meyer, DDS

strategies. At the extreme was Dixon, a special mission (reception center, geriatric unit, special program for disabled, special housing for patients with medical or mental health problems) facility, both medical and mental health, which at the time of our visit had a vacant Health Care Unit Administrator position, a vacant Director of Nursing position and in essence a vacant Medical Director position filled by a Wexford "travelling medical director." Special mission facilities serve a function for the entire prison system and thus tend to concentrate medical pathology or problems. As a result of the concentration of medical problems, a program that is not effectively managed creates the potential for harm to the patients and legal liability to the State. The degree of breakdowns we found at Dixon were the most severe. There must be a requirement that a Medical Director hired by Wexford must be board certified in primary care, preferably either family medicine or internal medicine. In addition, the one Health Care Administrator responsible for both NRC and Stateville had been taking extended leaves of absence. This is a vehicle for failure. Additionally, the Director of Nursing position at each facility, commonly a vendor position, must have the responsibility on a full-time basis for overseeing nursing clinical services. We are told that at several sites they have an additional administrative assignment with regard to Wexford corporate responsibilities. This is not acceptable. The oversight of a substantial nursing program is a full-time job. No time should be taken away from that responsibility. The leadership vacuums at Dixon, Stateville and NRC have resulted in process and care breakdowns on a daily basis. Reception is not done timely and medical records are almost impossible to effectively utilize at NRC despite the fact that there is a person onsite in charge of medical records. At Illinois River, the Medical Director position was vacant and this was being filled two days per week by the Medical Director from East Moline. There appeared to be an effective Director of Nursing who attempted to fill in also as the Health Care Unit Administrator, since that position was filled by someone on military leave for the past year and a half. At Hill Correctional Center, both the Health Care Administrator position and Director of Nursing position were filled by individuals who appeared to be quite capable. The Medical Director position is filled by a doctor for whom we identified clinical concerns during our record reviews and mortality reviews. At Menard, the Medical Director position is filled by a clinician trained as a general surgeon. This facility also has no primary care trained clinicians, even though the overwhelming majority of clinical responsibilities fall within the primary care field. There is no Director of Nursing at Menard; however, the Health Care Unit Administrator appears quite capable and makes an effort to fill in. However, as indicated through this review of eight institutions, very few if any with the exception of Pontiac have a complete team with all positions filled by capable individuals. It is not surprising that the weaker the leadership the poorer the medical performance. Each program's performance should be measured at least annually and, where indicated, leadership changes must be made.

We found clinician quality to be highly variable across the institutions we visited and across medical records we reviewed. There were examples of high quality clinicians at some facilities, but in other instances the quality of clinical care was poor and resulted in avoidable harm to patients. For example, none of the three physicians at one institution we visited had any formal training in a primary care field. During the course of our review of the care at this facility, we came across several examples of avoidable harm to patients resulting from inappropriate management of common primary care conditions. For example, at Menard, patient [REDACTED] developed a diabetic foot ulcer that was not appropriately managed and resulted in amputation. This same patient, a type 1 diabetic, had his insulin discontinued in response to well controlled

blood sugars, which resulted in dramatic deterioration of his diabetes control. This error reflects a lack of understanding of the basic pathophysiology of this common disease. In another instance at this facility, patient [REDACTED] presented with poorly controlled diabetes and the doctor tripled his insulin dose and quadrupled the dose of his oral medication. This of course resulted in repeated episodes of low blood sugar. Luckily the patient knew to refuse his medication in order to avoid serious harm.

At Illinois River, a 26-year-old man ([REDACTED]) repeatedly informed health care staff that he had atrial fibrillation, a fact that was confirmed by his jail records, but this history was discounted until he suffered a stroke. Had clinical staff listened to the patient and reviewed his jail record, they would have learned that he should have been on blood thinners to reduce the chances of this devastating event. At the same facility, Patient [REDACTED] presented with classic signs and symptoms of lung cancer from the time he arrived in IDOC, yet these were ignored by health care staff for three months. By the time he was finally diagnosed, the only treatment he was eligible for was palliative radiation, which he declined. He died nine days later.

The hiring of underqualified clinicians into the system is problematic, as evidenced by the examples stated above. By "underqualified," we do not mean that the provider is not qualified to practice medicine, but rather underqualified to practice the type of medicine required of the position. For example, a general surgeon is underqualified to practice primary care in the same way an internist is underqualified to practice general surgery. This problem is compounded by a lack of clinical oversight and peer review, both locally and centrally, and a lack of electronic resources, which prevents clinicians from having access to information vital to medical decision making at the point of care. We recommend that all Medical Directors be board certified in a primary care field and staff physicians have successfully completed a primary care residency. It is necessary that all clinicians have access to electronic educational resources at the point of care. This means that computers with internet access should be present in the exam rooms so that providers can access essential clinical information at the time they are seeing the patients. There should be periodic peer review of clinical practice, both at the local/facility level and centrally. At most of the facilities we visited, the Medical Directors were functioning in primarily clinical roles and spent little if any time reviewing the clinical practice of the other providers or engaging in other important administrative duties.

Staffing deficiencies are facility specific to Stateville and Dixon with regard to the number of vacancies. For example, 23 of Stateville's 66 budgeted positions are vacant, and 18 of Dixon's 66 budgeted positions are vacant. Adding to the problem is that key leadership positions are vacant at these two facilities. Stateville's Health Care Unit Administrator, who is also responsible for the NRC, has been on an extended medical leave of absence. Added to that is the issue that 10 of the 20 budgeted correctional nurse II registered nurse positions are vacant, as well as 10 of the 18 budgeted correctional medical technician positions. While this number of vacant positions creates a significant operational issue, the problem becomes worse because Stateville nursing staff is required to assist at the NRC with intake and operation of the NRC health care unit, and Stateville nursing staff is reassigned to the NRC when NRC nursing staff does not report to work. The NRC schedule E of approved budgeted positions only provides for eight positions, none of which are nursing staff. As a result, health care delivery suffers significantly, which affects access to care and results in delays in treatment. Staffing at NRC

While it is IDOC policy that each month the institutional Medical Director reviews the documentation of two sick call encounters per provider, i.e., RN, LPN or CMT for completeness, this is a retrospective paper review to determine that the provider answered all the questions and checked all the boxes on the pre-printed treatment protocol form. There is no way, however, for the physician reviewer to determine if the provider accurately interpreted and documented physical findings in order to determine an appropriate assessment and treatment.

At each of the facilities inspected, when a non-registered nurse conducted sick call, there was no immediate review by a registered nurse or physician to insure the provider conducted an appropriate physical assessment and accurately interpreted physical findings.

Of particular concern, specifically at Stateville and Pontiac, is the frequent arbitrary cancelling of sick call encounters by security staff. Such practices represent significant impediments to access to care and result in delays in treatment.

Of notable concern at Dixon is the practice of medical staff only permitting a patient to voice one concern at an encounter despite multiple concerns listed on the sick call request. Since inmates are charged a co-pay for medical services, inmates interviewed at Dixon were of the opinion that being permitted to have only one health care complaint addressed at an encounter was a "money making" scheme for the State.

At some facilities, most notably NRC and Dixon, it was difficult to impossible to evaluate sick call because a Sick Call Log has not been developed or maintained. In fact, during the four days at NRC, a sick call list could not be presented even though requested multiple times.

Hill Correctional Center has developed a sick call system with the above numbered elements in place. Only rarely does a non-registered nursing staff member review/triage sick call requests and conduct sick call. This generally happens when sick call flows over to the 3-11 shift, and a Licensed Practical Nurse would complete any remaining sick call from the day shift.

**Recommendations:**
1. Each facility is to develop and implement a plan to insure:
   a) Sick call is conducted in a defined clinical space that is appropriately equipped and provides patient privacy and confidentiality.
   b) Sick call requests are confidential and to be viewed only by medical staff.
   c) The review/triage of sick call requests and conducting of sick call is performed by a licensed registered nurse.
   d) Legitimate sick call encounters to include collecting a history, measurement of vital signs, visual observations and a "hands-on" physical assessment.
   e) There must not be arbitrary restrictions on the number of symptoms to be addressed at an encounter.
   f) Following Office of Health Services established policy and procedure.
   g) Complete documentation.
   h) Implementation and maintenance of a sick call log.
2. Administration must insure health care activities such as sick call are not routinely cancelled, as this results in an unacceptable delay in health assessment.

# APPENDIX A

# Stateville Correctional Center

# (SCC) Report

February, 2014

Prepared by the Medical Investigation Team

Ron Shansky, MD
Karen Saylor, MD
Larry Hewitt, RN
Karl Meyer, DDS

# Overview

On January 21-23, and February 24-25, 2014, we visited the Stateville Correctional Center in Joliet, Illinois. This was the first site visit to SCC and this report describes our findings and recommendations. During this visit, we:

- Met with leadership of custody and medical
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

We thank Warden Michael Magana and his staff for their assistance and cooperation in conducting the review.

# Executive Summary

Stateville is a maximum-security facility. The current population for the entire complex (Northern Reception Center, Minimum Security Unit and Stateville proper) is 4078 inmates, approximately 1600 of whom were housed at Stateville proper, the focus of this report. The maximum-security unit has a 32-bed infirmary which serves the entire complex. There are four dialysis chairs at Stateville which can therefore accommodate up to 18 dialysis patients.

There is a major problem with access to care at this facility. Clinics are frequently cancelled due to lockdowns, staffing issues, and to a lesser degree by "no shows," thus resulting in delayed or missed chronic care clinics, telemedicine visits and sick call. In the charts that we reviewed, anywhere from 33% to 75% of scheduled appointments were cancelled for these reasons.

The Medical Director is a surgeon by training and chart reviews suggested that his primary care skills are not up to date. The other physician has more current skills, but ironically defers to the Medical Director for cases which are more complex or higher risk. Neither physician has access to any electronic medical references or resources; this decreases the likelihood that patients will be treated according to the most current accepted standards of care. This was indeed the case in many of the charts we reviewed.

A global problem with the chronic care program is that patients are not scheduled according to their degree of disease control, but rather by the calendar month. This is a statewide policy issue which needs to be corrected. We also found many instances in which patients' chronic diseases were not managed as aggressively as they should have been when their degree of control was poor. In many of the charts that we reviewed, the problem lists were not updated.

With regard to the diabetes clinic, the timing between insulin administration and the start of the meals can be quite variable, and feeding times change day-to-day, placing patients at